AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: EMJ 4.06.2026

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

FILED
APR 06 2026
JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
BY [signature], DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

SAMSUNG GALAXY A16 5G IMEI: 3542261838981231, IMEI (2): 354553478981236 & SAMSUNG GALAXY A16 5G IMEI: 356256222264903, IMEI (2): 357661982264903

Case No. MJ-26- 177-ALM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2423(b) | Travel with Intent to Engage in Illicit Sexual Conduct |
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

See attached Affidavit of Special Agent Paige Lang, Federal Bureau of Investigation, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Paige Lang, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/6/2026

[signature: Amanda L Maxfield]
*Judge's signature*

City and state: Oklahoma City, Oklahoma

United States Magistrate Judge Amanda L. Maxfield
*Printed name and title*

**THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES: SAMSUNG GALAXY A16 5G IMEI: 354261838981231, IMEI (2): 354553478981236 AND SAMSUNG GALAXY A16 5G IMEI: 356256222264903, IMEI (2): 357661982264903 | Case No. ________________ |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Paige Lang, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation and have been since February of 2022. During my training and since that time, I have received formal training from the FBI as well as training through contact with experts from various law enforcement agencies regarding a wide range of criminal offenses including cases involving child pornography and sexual exploitation of children.

2. As a Special Agent with the FBI, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3. The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, documents and other records. This Affidavit is made in support of an application, under Rule 41 of the Federal Rules of Criminal Procedure, for a warrant to search the following cellular phones: Samsung Galaxy A16 5G IMEI: 354261838981231, IMEI (2): 354553478981236; and Samsung Galaxy A16 5G IMEI: 356256222264903, IMEI (2): 357661982264903 (hereinafter, the "**SUBJECT DEVICES**"). The **SUBJECT DEVICES** are

currently located in the Western District of Oklahoma, in the Evidence Control Room at the FBI Oklahoma City Field office in Oklahoma City, Oklahoma. The **SUBJECT DEVICES** are described in detail in Attachment A to this Affidavit. I request a warrant to search the **SUBJECT DEVICES** for the items specified in Attachment B hereto, which constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct), 18 U.S.C. § 2422(b) (Coercion and Enticement of a Minor), and 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography).

4. This investigation, described more fully below, has revealed probable cause to believe Travis O'Connor ("O'CONNOR") used an instrumentality of interstate commerce to persuade a minor to engage in sexual activity and traveled in interstate commerce with intent to engage in illicit sexual conduct. Accordingly, there is probable cause to believe evidence, fruits, and instrumentalities of such violations are located on the **SUBEJCT DEVICES**. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States...that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## TERMS

6. The following definitions apply to this Affidavit and Attachment B:

a. "Computer," as used broadly herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones. *See* 18 U.S.C. § 1030(e)(1).

b. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

c. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

d. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

e. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f. "Child Sexual Abuse Material" or "Child pornography," includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer images, or computer-generate image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor

is engaged in sexually explicit conduct. *See* 18 U.S.C § 2256(8).

g. "Sexually explicit conduct" applies to visual depictions that involve the use of a minor, *see* 18 U.S.C § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, *see* 18 U.S.C § 2256(8)(C). In those contexts, the term refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between person of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. *See* U.S.C. § 2256(2)(A).

h. "Visual depictions" include undeveloped file and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. 2256(5).The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail remote storage, and co-location of computers and other communications equipment.

j. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a form that

resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and e-mail.

k. "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages, or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

## BACKGROUND ON DISCORD

7. Based on my training and experience, I am familiar with the social media and/ communication platform called Discord, and I have participated in child exploitation investigations involving this platform. I have also spoken with other experienced law enforcement agents who have investigated criminal conduct occurring on this platform, and I have researched the platform and its capabilities on the Internet. Based on this experience, I know the following information about Discord.

8. Discord owns and operates a free-access, all-in-one voice and text chat application and website of the same name that can be accessed via the internet at http://www.discordapp.com. Discord is a "cross-platform" application, which is available for Microsoft Windows, Mac OS, Android, Apple iOS and Linux operating systems. Discord currently has approximately 25 million users and targets gamers in the gaming community.

9. Discord has the ability to maintain information associated with the web history of its users. Such information is materially relevant in child exploitation investigations, as it may help in identifying websites used by subjects to obtain child pornography and locate victims.

10. Discord allows its users to establish accounts, which they can then use to communicate with other Discord users. Discord also allows users to create servers, or chat

rooms, to host discussion on any topic. A server can be configured as public, meaning anyone can join, or it can be configured to be private. To participate in a private server, a user must be invited by another user who already belongs to that private server. Invitations can be configured to expire after a short period of time, limited to the number of times an invitation can be shared, and even be configured to limit a user to participating in the group one time.

11. Similar to other communications platforms, Discord users are able to create and maintain a friends list, participate in multiple servers or communications channels, and set their current status indicator to appear online, away, or invisible to other users.

12. To use Discord, a user creates an account and uses the account to communicate with other Discord users. When signing up for a Discord account, the user must agree to Discord's Terms of Service, which state, among other things: "You agree not to use the [Discord] Service in order to: violate any applicable laws or regulations, or promote or encourage any illegal activity...."

13. I also know Discord requires users to provide basic contact information to Discord, either during the registration process or thereafter. The information may include the user's full name, birthdate, contact e-mail addresses, physical address (including city, state, and zip code) telephone numbers, screen names, websites, and other personal identifiers. Discord also assigns a user identification number ("ID") to each account.

14. Discord may also retain Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Discord, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Discord profile, that user's IP log would reflect the fact the user viewed the profile and would show when and from

what IP address the user did so, which could further assist law enforcement in confirming the location of the offense conduct.

15. There are different features a user can access on Discord. Discord users can exchange private messages between users (messages that do not appear in any text channel, but which are revealed only to the users participating in the private communication), participate in text chat room discussions, and voice chat. Users can include text, audio, images and videos in the messages that they exchange. Discord users can also use a video call and/ video chat feature which allows users to transmit live videos to other discord users. Discord users can also create "servers," which are akin to message boards that can only be accessed by users who have an "invitation link." Within these servers, users can set up different "text channels," where users can type written text, upload files under eight megabytes, and record these communications. Additionally, within these servers, users can be categorized and assigned designated roles. Such categorization and designation can provide users with different levels of access to the particular server and the text channels within the server.

16. Social networking providers like Discord typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Discord users may communicate directly with Discord about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Discord typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any action taken by the provider or users as a result of the communications.

17. The computers or servers of Discord are likely to contain all material just described, including stored electronic communications and information concerning subscribers and their use of Discord, such as account access information, transaction information, and account activation.

## BACKGROUND ON TELEGRAM

18. Telegram is a messaging application outside of the United States. An individual can access Telegram through an application installed on a compatible computer or mobile device. Telegram users can message and call other Telegram users, can create group conversations, and send photographs, videos, and other files to other Telegram users. Telegram also provides end-to-end encryption and video calling, voice over Internet protocol, and file sharing, along with several other features. Users can choose to delete messages they have sent or received. Users are able to delete messages for their device and the device they were communicating with.

19. Users can join Telegram by creating an account linked to a telephone number. Users can set up an account username which can be shared instead of telephone numbers. Telegram provides limited records to law enforcement, making it an attractive application to use for those who commit crimes.

## BACKGROUND OF YOUTUBE

20. YouTube is owned and operated by Google. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps,

and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account

21. Google offers a video platform called YouTube that offers Google Accounts the ability to upload videos and share them with others. Users can create a YouTube channel where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like videos, share videos with others, and save videos to watch later. More than one user can share control of a YouTube channel. YouTube may keep track of a user's searches, likes, comments, and change history to posted videos. YouTube also may keep limited records of the IP addresses used to access particular videos posted on the service. Users can also opt into a setting to track their YouTube Watch History. For accounts created before June 2020, YouTube Watch History is stored indefinitely, unless the user manually deletes it or sets it to auto-delete after three or eighteen months. For accounts created after June 2020, YouTube Watch History is stored for three years, unless the user manually deletes it or sets it to auto-delete after three or eighteen months.

**BACKGROUND ON ZOOM**

22. Zoom is a U.S. electronic communications technology company with headquarters in San Jose, California, but with operations around the world. Zoom provides videotelephony and online chat ("video chat") communication services through a cloud-based peer-to-peers software platform and is used for teleconferencing, telecommuting, distance education, and social relations. Zoom's user can host or participate in video chat "meetings" that allow as many as hundreds or thousands of users to see, hear, and speak with each other from locations around the world.

23. Zoom asks users to provide basic contact and personal identifying information to

Zoom, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact email addresses, Zoom Passwords, physical address (including city, state, zip code), telephone numbers, screennames, websites, and other personal identifiers.

24. Zoom users can exchange private written messages on Zoom with other users. Those messages are stored by Zoom unless deleted by the user. Additionally, according to their "Frequently asked questions" page, a Zoom account is not required if you are strictly joining a Zoom Meeting as a participant. If someone invites you to their meeting, you can join as a participant without creating an account. However, an account is only required if you need to create your own meetings and send invitations to participants.

25. Providers like Zoom typically retain additional information about their users' accounts, such as information about the length of services (including start date), the type of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account numbers). In some cases, Zoom users may communicate directly with Zoom about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Providers like Zoom typically retain records about such communications, including records of contact between the user and the provider's support services, as well as records of any action taken by the provider or user as result of the communications.

26. As explained herein, information stored in connection with a zoom account may provide evidence of the "who, what, when, where, why, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, A zoom user's IP

log, stored electronic communications, and other data retained by Zoom, can indicate who has used or controlled the Zoom accounts. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information and private messaging logs (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the zoom account at the relevant time. Further, Zoom account activity can show how and when the account was accessed or used. For example, as described herein, Zoom logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Zoom access, use, and events relating to the crime under investigation. Additionally, Zoom may include geo-location in some of its services. This geographic and timeline information may tend to either inculpate or exculpate the Zoom account owner. Last, Zoom account activity may provide relevant insight into the Zoom account owner's state of mind as it relates to the offense under investigation. For example, information of the Zoom account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guild (e.g., deleting account information in an effort to conceal evidence from law enforcement.)

27. Therefore, the computers of Zoom are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Zoom, such as account access information, transaction information and other account information.

## FACTS OF INVESTIGATION

28. On or about March 15, 2026, Norman Police Department ("NPD") received a report of an alleged sexual assault of a minor. Sixteen-year-old Minor Victim[1] (M.V.), a resident of Norman, Oklahoma, disclosed to her mother that on the night of March 14, 2026, Travis O'CONNOR picked her up from her family's residence and took her to Room 204 of the Hampton Inn and Suites ("Hampton Inn") located at 2300 Conference Drive, Norman, Oklahoma 73069. While they were at the hotel, O'CONNOR and M.V. engaged in vaginal and anal intercourse. O'CONNOR, a forty-four-year-old from Muscatine, Iowa, was previously convicted in the Northern District of Iowa for activities relating to material constituting or containing child pornography and sentenced to 120 months in prison and 60 months of supervised release in 2008.

29. On or about March 18, 2026, M.V. was interviewed at the Marry Abbott Children's House in Norman, Oklahoma. M.V. disclosed that she met O'CONNOR online when she was thirteen years old. Their relationship began when O'CONNOR commented on M.V.'s YouTube video, telling her she was pretty and "well equipped." O'CONNOR and M.V. engaged in conversations in the comment sections of her YouTube videos. From there, O'CONNOR requested M.V. make videos of her doing various things. For example, O'CONNOR requested M.V. to put on a white shirt and pour water on herself. M.V. stated she poured water onto the shirt first and then put on the shirt. M.V. believed she had underwear on when she made the video, but nothing underneath the shirt. M.V. explained that she posted the videos on YouTube at the time, but she has since deleted them. While M.V. was thirteen-years-old, she engaged in conversations with other girls around her age on YouTube and told them about O'CONNOR. She said the other girls told her how he commented similar things on their YouTube videos. M.V.

[1] Minor Victim's name is known to law enforcement.

was upset with O'CONNOR for talking to other girls and stopped talking to him.

30. M.V. disclosed in her forensic interview that she reconnected with O'CONNOR when she was fifteen-years-old, and they communicated every day through the applications Telegram, Discord, and Zoom. O'CONNOR video chatted with M.V. and showed her pornographic videos on his computer. O'CONNOR wanted M.V. to watch him masturbate while he showed her pornography.

31. M.V. disclosed, on or about October 30, 2025, O'CONNOR travelled from Muscatine, Iowa to Norman, Oklahoma to pick up M.V. from her residence. Prior to this visit, O'CONNOR told M.V. to bring a lubricant to the hotel with her, so M.V. brought olive oil, and O'CONNOR brought coconut lotion. When O'CONNOR picked M.V. up, he gave her a hug and kissed her. O'CONNOR took M.V. to Room 413 at the Holiday Inn, which is located at 2500 Conference Drive, Norman, Oklahoma, 73069. O'CONNOR had M.V. wear a black hoodie with the hood up so the surveillance cameras could not see her. Once they arrived in the hotel room, O'CONNOR took off his pants and sat on the bed. O'CONNOR gestured for M.V. to come sit next to him, which she did. O'CONNOR took M.V.'s hand and placed it on his penis, and he began to move her hand up and down. Once M.V. was more comfortable, O'CONNOR had her perform oral sex on him. M.V. recalled that, on the first day they were in the hotel room, O'CONNOR attempted to engage in vaginal intercourse with M.V. M.V. stated that it hurt really badly, so he tried to use his fingers instead.

32. The following day, O'CONNOR used the olive oil to engage in vaginal and anal intercourse with M.V. M.V. stated that he was only able to penetrate her halfway both anally and vaginally, which made M.V. bleed from her vagina. After they engaged in sexual intercourse on

the second day, O'CONNOR had M.V. perform oral sex on him.[2] M.V. stated they used the olive oil both days when O'CONNOR attempted to penetrate her.

33. After O'CONNOR's visit in 2025, M.V. and O'CONNOR continued their daily contact through Discord, Telegram, and Zoom. During the video chats, O'CONNOR instructed M.V. to masturbate and insert her fingers and other items inside her vagina. O'CONNOR would masturbate as he watched M.V. do this. M.V. stated this occurred almost every weekend.

34. M.V. also provided information about O'CONNOR's most recent visit. M.V. disclosed, on or about March 14, 2026, O'CONNOR traveled from Muscatine, Iowa to Norman, Oklahoma to pick up M.V. from her residence. O'CONNOR took M.V. to the Hampton Inn. Again, O'CONNOR had M.V. wear a hoodie with the hood pulled up over her head. He further instructed her to enter Room 204 of the Hampton Inn approximately five minutes before he entered. M.V stated that it did not take long for them to engage in vaginal intercourse after O'CONNOR entered the hotel room. O'CONNOR instructed M.V. to be still and not to make any noise. O'CONNOR brought a penile shaped sex toy and instructed M.V. to put it in her mouth to prevent her from making noise.

35. When M.V. arrived back at her house on March 15, 2026, she realized her parents had taken her digital devices. M.V. knew her parents were aware of everything because M.V.'s devices still had the chat log from O'CONNOR, which coordinated where they would meet. M.V. regained access to her devices and messaged O'CONNOR that her parents knew everything and that he needed to leave.

36. NPD obtained surveillance footage from Hampton Inn for the night of March 14,

[2] NPD has since obtained a receipt from the Holiday Inn that confirmed O'CONNOR's stay there from October 30, 2025 through November 1, 2025.

2026, which showed M.V. entering Room 204 of the Hampton Inn and, approximately two minutes later, O'CONNOR entering the same hotel room, Room 204. NPD also used a law enforcement database which showed O'CONNOR's vehicle traveled through Missouri and Kansas towards Oklahoma on March 14, 2026.

37. During M.V.'s interview, local law enforcement also learned that O'CONNOR's residence was searched by law enforcement in Muscatine, Iowa in January 2026. O'CONNOR told M.V. that his house was searched by law enforcement because he engaged in a conversation with another individual where they exchanged adult pornography. O'CONNOR claimed that the other individual sent O'CONNOR a video that contained child pornography, and O'CONNOR accidently downloaded it to his device.

38. On or about March 15, 2026, NPD arrested O'CONNOR on four counts of rape and one count of lewd acts with a child under 16 years of age. O'CONNOR is currently in custody at the Cleveland County Detention Center.

39. On or about March 15, 2026, NPD performed a search of Room 204 at the Hampton Inn while O'Connor was in the room. As O'Connor exited the hotel room, NPD seized a Samsung Galaxy A16 5G, IMEI: 356256222264903 IMEI (2): 357661982264903, off his person. On or about March 15, 2026, NPD also performed a search of O'CONNOR's vehicle, where they seized a second Samsung Galaxy A16 5G cell phone, IMEI: 354261838981231, IMEI (2): 354553478981236. These are the **SUBJECT DEVICES**.

40. On or about March 27, 2026, FBI collected the **SUBJECT DEVICES** from NPD and transported the evidence to Oklahoma City FBI's evidence control room for storage.

41. Based on this information, there is probable cause to believe the **SUBJECT DEVICES** contain evidence of O'CONNOR's crimes.

## BACKGROUND ON DIGITAL MEDIA STORAGE DEVICES AND CHILD PORNOGRAPHY

42. The ability of a computer (including a smartphone) to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in personal computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Given the storage capabilities, modern computers can retain many years' worth of a user's data, stored indefinitely. Even deleted data can often be forensically recovered. Other digital media storage devices (e.g., compact discs, digital video discs, thumb drives, etc.) can also store tremendous amounts of digital information, including digital video and picture files.

43. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data. Further, even if deleted, the forensic examination can sometimes recover files and data, including deleted picture files. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it. I know that computers such as laptops and iPhones and other smartphones can be forensically examined, and forensic analysts can learn much detail about the user's habits and online activities, including websites visited, files downloaded, Google

searches performed, locations where the device was used, dominion and control information, etc.

44. Computers and other digital file storage devices can store the equivalent of thousands of pages of digital information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires the searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks depending on the volume of the data stored, and it would be generally impossible to accomplish this kind of data search on site. Furthermore, I know that smartphones (a type of "computer," as broadly defined in 18 U.S.C. § 1030(e)(1)), like an iPhone, can typically "synch" with a traditional desktop or laptop computer. The purpose of synching a smartphone to a traditional computer is to back up data that is stored on the phone so that it is not permanently lost if the portable smartphone is lost or damaged. Also, smartphone users may move files off the smartphone and onto a computer to free up storage space on the smartphone. Similarly, computer (e.g., desktop computer, smartphones, etc.) users may move files off of one computer onto another computer or digital file storage device such as a thumb drive, a DVD, or an external hard drive to free up space on the computer.

## SEARCHING COMPUTERS

45. Searching computers, including smart phones, for criminal evidence is a highly technical process requiring skill and a properly controlled environment. The search of a computer or computer system is an exacting scientific procedure designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is vulnerable to tampering or destruction, the controlled atmosphere of a laboratory is essential to complete this task. The FBI, Oklahoma City Division has such a laboratory staffed with certified computer forensic examiners. An extraction of the original

storage media will be produced by the assigned forensic examiner and then uploaded to a secure review network for Case Agent review, so as to maintain the integrity of the original evidence.

## SPECIFICS OF SEARCH AND SEIZURE OF CELL PHONES

46. Searches and seizures of evidence from smartphones commonly require agents to download or copy information from the smartphones and their components, such as a flash drive or other digital storage units attached to the phone, to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true for the following two reasons:

47. Smartphone devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all of the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

48. Searching smartphones for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of smartphone hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a smartphone system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since smartphone evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the

controlled environment of a laboratory is essential to its complete and accurate analysis.

49. In order to fully retrieve data from a smartphone system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child exploitation where the evidence frequently includes graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all of the system software (operating systems or interfaces, and hardware drivers) and any application software which may have been used to create the data (whether stored on hard drives or on external media).

50. Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I know that individuals who harbor the intent to view/access/possess child pornography often use their smartphones to view/access/possess such materials. Part of behavior stems from the individuals' reluctance to be without their child pornography for any prolonged period of time. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Therefore, I believe there is probable cause to search the **SUBJECT DEVICES** for fruits, evidence, and instrumentalities of the aforementioned offenses.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

51. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

52. I assert there is probable cause to believe that things that were once stored on the **SUBJECT DEVICES** may still be stored there, for at least the following reasons:

53. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

54. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

55. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **SUBJECT DEVICES** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT DEVICES** because:

56. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

57. Forensic evidence on a device can also indicate who has used or controlled the

device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

58. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how an electronic device was used, the purpose of its use, who used it, and when.

59. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

60. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **SUBJECT DEVICES** to human inspection in order to determine whether it is evidence described by the warrant.

62. Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto any premises. Consequently, I submit there is reasonable cause for this

Court to authorize the execution of the warrant at any time in the day or night.

**Conclusion**

63. Based on the above information, there is probable cause to believe that the foregoing laws have been violated, and that evidence of these offenses is located on the **SUBJECT DEVICES**.

64. Based upon the foregoing, I respectfully request that this Court issue a search warrant for the **SUBJECT DEVICES**, described in Attachment A, authorizing the seizure of the items described in Attachment B to this Affidavit.

Paige Lang
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me this 6th day of April, 2025.

AMANDA L. MAXFIELD
United States Magistrate Judge

# ATTACHMENT A

## DESCRIPTION OF SUBJECT DEVICES

One Samsung Galaxy A16 5G IMEI: 354261838981231, IMEI (2): 354553478981236, maintained at the FBI Oklahoma City Field Office, Evidence Control Room, which was seized from O'CONNOR's vehicle. Photographs of the front and back of **SUBJECT DEVICE #1** are pictured below.



Another Samsung Galaxy A16 5G IMEI: 356256222264903, IMEI (2) 357661982264903, maintained at the FBI Oklahoma City Field Office, Evidence Control Room, which was seized off O'CONNOR's person. Photographs of the front and back of **SUBJECT DEVICE #2** are pictured below.



## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1. All records on the **SUBJECT DEVICES** described in Attachment A that relate to violations of 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct), 18 U.S.C. § 2422(b) (Coercion and Enticement of a Minor), and 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography), including:

2. Computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3. Notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, and other electronic messages) pertaining to the coercion and enticement of a minor.

4. In any format and medium, all originals, computer files, and copies of child pornography as defined in 18 U.S.C. § 2256(8), and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

5. Notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, or other electronic messages), identifying persons transmitting, through interstate or foreign commerce by any means, any child pornography as defined in 18 U.S.C. § 2256(8), or any visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6. Notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, or other electronic

messages, other digital data files, or web cache information) concerning the receipt, transmission, manufacture, or possession of child pornography as defined in 18 U.S.C. § 2256(8), or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), or communication with minors.

7. Notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs, other electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

8. Any notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

9. Any records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer

storage, and user logins and passwords for such online storage or remote computer storage.

10. Any visual depictions of minors engaging in sexually explicit conduct.

11. Contact lists, mailing lists, supplier lists, and any documents and records, in any format or medium (including, but not limited to, e-mail messages, chat logs, other electronic messages, and other digital data files), pertaining to the preparation, purchase, or acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, any child pornography as defined in 18 U.S.C. § 2256(8), or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12. Any notes or other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

**This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.**